Bertram W. BERUBE

v.

RUST ENGINEERING

and

MGA Insurance Services.

Supreme Judicial Court of Maine.

Argued Sept. 21, 1995.

Decided Dec. 13, 1995.

Ralph Tucker (orally), Maureen Dea, McTeague, Higbee, MacAdam, Case, Watson & Cohen, Topsham, for Employee.

Nelson J. Larkins (orally), Preti, Lfaherty, Beliveau & Pachios, Portland, for Employer.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

GLASSMAN, Justice.

The employer, Rust Engineering, appeals from a decision of the Workers' Compensation Commission granting the petitions of its employee, Bertram W. Berube, for an award of compensation and to fix the amount to be allowed for a work-related injury sustained by him. Rust contends the Commission erred in determining that, pursuant to 39 M.R.S.A. § 62–B(3)(A)(2) (1989),[1] it is entitled to offset against compensation paid Berube only that monthly amount attributable to Rust's contribution to the pension fund

---

1. Section 62–B has been repealed and replaced by 39–A M.R.S.A. § 221 that contains similar, but not identical, language. *Maine Workers' Compensation Act of 1992*, P.L.1991, ch. 885, § A–7 (effective Jan. 1, 1993). Because the pro-

ceeding was pending on the effective date of Title 39–A, this appeal is governed exclusively by former Title 39. *Riley v. Bath Iron Works*, 639 A.2d 626, 627–28 (Me.1994).

rather than the entire $1,452 that Berube received monthly from that fund. Because the Commissioner adopted a reasonable interpretation of ambiguous statutory language and there are no other indicia of legislative intent to suggest a contrary interpretation, we affirm the decision.

Berube was an iron worker employed by several employers through his labor union. Each of his employers contributed to the pension plan for union employees based on the individual employee's hours worked for that employer. According to a summary booklet outlining the benefit package, "[t]he entire cost of the Plan is paid by the contributing employers in accordance with their agreements with the union. Employees do not contribute to the Plan."

On September 8, 1990, Berube suffered a work-related knee injury while working for Rust. The parties stipulated that Berube suffers a 35% earning incapacity as a result of the injury and that his pre-injury average weekly wage was $1,060.33, including fringe benefit payments. Berube was laid off in October 1990 and began receiving pension benefits of $1,452 per month.

Berube's petitions filed in 1991 were granted in October 1992. The Commission construed the phrase "provided by the same employer" in subsection (3)(A)(2) to entitle an employer in a multi-employer pension plan to set off only that amount of the monthly pension payments attributable to its contribution to the plan. Accordingly, the Commission determined that $138.00 a month represented that portion of Rust's contribution to Berube's monthly pension benefit of $1,452, Rust is entitled to offset $138 monthly from the compensation paid Berube. Rust's motion for findings of fact and conclusions of law was denied. We granted Rust's petition for appellate review pursuant to 39–A M.R.S.A. § 322 (Supp. 1994–95).

Rust contends that, pursuant to the plain language of 39 M.R.S.A. § 62–B, an employer that partially funds a pension plan with other employers is entitled to offset against any compensation paid an employee pursuant to the Act the entire amount of the employee's monthly pension payments, regardless of that employer's contribution to the plan. Rust argues that, unlike subsection (3)(A)(3), which governs pensions paid for in part by direct employee contributions, subsection (3)(A)(2) does not expressly allow for an apportionment of the employer's offset.[2]

Subsection 62–B provides in pertinent part:

**2. Definitions.** As used in this section, unless the context otherwise indicates, the following terms have the following meanings.

. . . .

**B.** "Employee benefit plan" means a self-insurance disability plan, wage continuation plan, disability insurance plan and a pension or retirement plan which is funded or paid for by the employer in whole or in part. It does not include disability insurance under the United States Social Security Act.

**3. Coordination of benefits.** Benefit payments subject to this section shall be reduced in accordance with the following provisions.

**A.** The employer's obligation to pay weekly compensation under section 54–B or 55–B shall be reduced by:

. . . .

(2) The after tax amount of the payments received or being received under an employee benefit plan provided by the same employer by whom benefits under section 54–B or 55–B are payable if the employee did not contribute directly to the plan; and

(3) The proportional amount, based upon the ratio of the employer's contributions to the total contributions, of the after tax amount of the payments received or being received by the employ-

---

**2.** Berube concedes, for purposes of this appeal, that the plan was an "employee benefit plan" pursuant to subsection 62–B(2)(B). We therefore do not address whether the plan was "funded or paid for" by the employer, or whether the em- ployee paid for the plan through direct contributions from his average weekly wage. *See Ashby v. Rust Eng'g Co.,* 559 A.2d 774, 775–76 (Me. 1989).

ee under an employee benefit plan provided by the same employer by whom benefits under section 54–B or 55–B are payable if the employee did contribute directly to the plan.

39 M.R.S.A. 62–B (1989).

■ Our purpose in construing a statute is to give effect to the legislative intent as indicated by the statute's plain language, and we examine other indicia of legislative intent, such as its legislative history, only when the plain language is ambiguous. *Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994). We defer to the Commission's interpretation of the Workers' Compensation Act "unless the statute plainly compels a different result." *Id.* (quoting *Nielsen v. Burnham & Morrill*, 600 A.2d 1111, 1112 (Me.1991)). *See also Wood v. Superintendent of Ins.*, 638 A.2d 67, 70 (Me.1994) (Interpretation of statute by administrative agency "although not conclusive, is entitled to great deference and will be upheld 'unless the statute plainly compels a contrary result'" (citation omitted)).

■ We conclude that section 62–B is ambiguous on its face and therefore we look beyond the statutory language to determine the legislative intent. *Marchand v. Eastern Welding Co.*, 641 A.2d 190, 193 (Me.1994). We find nothing in the legislative history of section 62–B to suggest that the Legislature considered the possibility of a multi-employer pension plan. Section 62–B was enacted in 1985 as part of an emergency effort to reduce "the costs to employers of providing workers' compensation for their employees without unfairly removing the protections offered to those employees under the Workers' Compensation Act." L.D. 1634, Statement of Fact (112th Legis.1985). As we recently stated, "[t]he legislative debate suggests that the purpose of section 62–B was to ensure a minimum income during the period of an employee's incapacity and to prevent a double recovery of both retirement and compen-

sation benefits." *Jordan*, 651 A.2d at 361; *Berry v. H.R. Beal & Sons*, 649 A.2d 1101, 1103 (Me.1994).

Based on the ambiguity of the statutory language and the lack of other indicia of legislative intent, the Commission could reasonably have concluded that an employer who contributed to a multi-employer pension plan must be limited to an offset against any compensation paid its employee pursuant to the Act to the amount attributable to that individual employer's contribution to the plan. It cannot be said that the result reached by the Commission based on a reasonable interpretation of the statutory language frustrates the legislative goals of section 62–B or that the statute compels a different result.

The entry is:

Decision of the Workers' Compensation Commission affirmed.

WATHEN, C.J., and ROBERTS and CLIFFORD, JJ., concurring.

RUDMAN, Justice, with whom DANA and LIPEZ, JJ. join, dissenting.

I respectfully dissent. Implicit in the court's decision is the assumption that our Legislature was either unaware of or did not consider multi-employer pension plans when it enacted section 62–B in 1985 as part of an emergency effort to reduce "the costs to employers of providing workers' compensation for their employees without unfairly removing the protections offered to those employees under the Workers' Compensation Act." L.D. 1634, Statement of Fact (112th Legis.1985). The legislative debates reflect that the purpose for the amendment was to reduce workers' compensation costs and to prevent injured employees from receiving a double recovery of workers' compensation and retirement benefits. 2 Legis.Rec. 1184–85 (1st Reg.Sess.1985).[1] We have previously

1.   ... [T]he Workers' Compensation System was never really meant to supplement retirement. It was meant as wage replacement.

     ... [R]egardless of whether a person is at partial incapacity or total incapacity, there will always be a way for that particular person to get two-thirds of his total wages and that is

what the Workers' Compensation System was meant to be and that is what it does. What this Bill does is prevent double dipping....
2 Legis.Rec. 1184–85 (1985) (Statement of Sen. Dutremble).
     ... I think it is one of the most progressive steps that the Legislature has taken as far as

recognized the purposes of the enactment of section 62–B: (1) "to reduce insurance premiums and prevent carriers from withdrawing business from the state," *Jordan v. Sears, Roebuck & Co.,* 651 A.2d 358, 360–61 (Me.1994); (2) "to ensure a minimum income during the period of an employee's incapacity," *id.;* (3) to "prevent a double recovery of both retirement and compensation benefits," *id.;* (4) "to prevent the stacking of benefits," *Berry v. H.R. Beal & Sons,* 649 A.2d 1101, 1103 (Me.1994) (citations omitted); and (5) "to alleviate the burden on employers who are required to pay into the workers' compensation and social security systems." *id.*

Section 62–B provides in pertinent part:

**B.** "Employee benefit plan" means a self-insurance disability plan, wage continuation plan, disability insurance plan and a pension or retirement plan which is funded or paid for by the employer in whole or in part. It does not include disability insurance under the United States Social Security Act.

**3. Coordination of benefits.** Benefit payments subject to this section shall be reduced in accordance with the following provisions.

**A.** The employer's obligation to pay weekly compensation under section 54–B or 55–B shall be reduced by:

. . . .

(2) The after tax amount of the payments received or being received under an employee benefit plan provided by the same employer by whom benefits under section 54–B or 55–B are payable if the employee did not contribute directly to the plan;

(3) The proportional amount, based upon the ratio of the employer's contributions to the total contributions, of the after tax amount of the payments received or being received by the employee under an employee benefit plan provided by the same employer by whom benefits under section 54–B or 55–B are payable if the employee did contribute directly to the plan.

39 M.R.S.A. § 62–B (1989).

The "employee benefit plan" from which Berube is receiving benefits was funded and paid for by Rust in part. Berube made no contribution to the plan. Rust is paying benefits to Berube under sections 54–B or 55–B. The term "employee benefit plan" is a defined term. The term refers to a pension or retirement plan funded in whole or in part by the employer. Subsection 3 mandates that benefit payments be reduced and specifies how the reduction is to be calculated when the employee made a contribution to the plan and when an employee did not. Clearly, the Legislature knew how to provide for a proportional reduction if it intended one. Thus, a plain reading of the statute mandates that Rust's weekly obligation be reduced by "the after tax amount of the payments received or being received by Berube."

There is no ambiguity in section 62–B. The statute's language is plain and should be followed in order that the purposes for which the statute was enacted be achieved. We need not defer to the interpretation of a single commissioner when the meaning of a statutory provision is plain when viewed in the entirety of the legislative scheme. It is both illogical and unnecessary in the face of the plain language of the statute to conclude that the Legislature intended to treat multi-employer pension plans any differently than plans provided by a single employer.

I would vacate the decision of the Workers' Compensation Commission.

Workers Compensation is concerned, income averaging or including the income of other sources that people are receiving when determining a wage replacement. . . . I think this is a good coordination of benefits that people are receiving and accountability during tough times that people expect. We are not saying that people should be denied less than that, we are just saying that particular program, when you are setting that particular level, you should include it whether it is Social Security, or whether it is another type of program that people are receiving assistance from, not just Social Security, and that figure should come up to and not exceed that particular level. 2 Legis.Rec. 1185 (1985) (Statement of Sen. Baldacci).